IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 07-20130-MlV |
| | ) |
| | ) |
| LARRY CRADLER, | ) |
| | ) |
| Defendant. | ) |

---

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

---

The defendant, Larry Cradler, was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The indictment charges Cradler with possession of a Colt .380 caliber pistol.

Presently before the court is Cradler's November 6, 2007 motion to suppress all evidence seized by law enforcement officials during the detention and search of Cradler at a traffic stop. The traffic stop, and subsequent detention and search, took place in a store parking lot at the intersection of Chelsea and Seventh in Memphis, Tennessee, on November 25, 2006. Cradler was a passenger in a vehicle, driven by Effie Davis, which was stopped because Davis was violating the mandatory seatbelt law. Cradler claims that the detention and search were conducted in violation of his rights under the Fourth Amendment. The motion was referred to the United States Magistrate Judge for a report and recommendation

pursuant to 28 U.S.C. 636(b)(1)(B)-(C).

Pursuant to the referral, an evidentiary hearing was held on February 20, 2008. This court heard testimony from five different witnesses and received three evidentiary exhibits. The government called only one witness, Officer David Arocho, and introduced as evidence the arrest ticket on Davis ("Ex. 1"), Cradler's rights waiver form ("Ex. 2"), and the arrest ticket on Cradler ("Ex. 3"). Cradler called Davis, Officer Dolphus McGee, Tony Lee Thomas, and Linda Faye Williams as witnesses.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## PROPOSED FINDINGS OF FACT

On the evening of November 25, 2006, Memphis Police Department ("MPD") Officers Arocho and McGee conducted a traffic stop involving a vehicle driven by Davis and in which Cradler as a passenger. Officer Arocho testified that he was working as part of a Blue Crush saturation effort[1] when he observed Davis driving her truck without wearing a seatbelt. He testified that Davis pulled

---

[1] Operation Blue Crush is a program conducted by the MPD in which officers are placed in areas having a high risk for crime. The officers monitor the area for criminal activity and adhere to a zero tolerance policy, issuing citations or making arrests for any offenses they observe.

2

her truck into the parking lot of the store where he was standing at Chelsea and Seventh and stopped. Officer Arocho and his partner, Officer McGee, approached the vehicle, with Officer Arocho on the passenger's side and Officer McGee on the driver's side. Officer McGee questioned Davis, and he learned that she was driving on a revoked license and had no insurance. Davis was removed from the vehicle and placed under arrest. (*See* Ex. 1.)

Officer Arocho testified that he began to question Cradler after learning Davis was driving without a license. Officer Arocho asked Cradler, who was still sitting in the vehicle, for his name, date of birth, and social security number. He testified that Cradler could not provide any identification and seemed to have trouble remembering his date of birth and social security number, providing multiple answers for each. The conflicting and vague answers caused Officer Arocho to become suspicious that Cradler was either hiding something or did not want to divulge his true identity. Officer Arocho decided to have Cradler step out of the vehicle so he could continue trying to determine who Cradler really was. As Cradler stepped out of the vehicle, Officer Arocho heard an object fall to the ground. Officer McGee alerted him that it was a gun, and Officer Arocho handcuffed and secured Cradler. Officer Arocho testified that Cradler did not provide his correct name, date of birth, or social security number until he was placed in the back of the squad car. After determining Cradler's true

3

identity on Station B, Officer Arocho learned that Cradler had an outstanding warrant and that the gun was reported stolen. Officer Arocho stated that he had Cradler execute a rights waiver form (*see* Ex. 2.), and he then conducted an interview with Cradler while in the squad car. After the interview, Officer Arocho filled out Cradler's arrest ticket. (*See* Ex. 3.)

The second witness to testify was Effie Davis, the driver of the vehicle in which Cradler was a passenger. Davis testified that Cradler is her cousin and was riding with her when she arrived at the store on the corner of Chelsea and Seventh. She stated that she noticed the police across the street working another traffic stop. After she parked the car, Davis got out and began to walk up to the store when the police stopped her and asked for her identification. Davis stated that after she did not produce her driver's license, the police got violent with her and "slung [her] around like a dog." She claimed the police treated her as if she had killed "thousands" of people.

Davis stated that the gun fell out of the truck when the police officer told Cradler to get out of the truck. She testified that Cradler had no idea how the gun got there and that it was not his. She said that they had just dropped off a young man who had been fighting with someone. Davis said that gun must have been that young man's, and that young man must have dropped it. She could not remember the name of the young man she gave a ride to

4

that night, only stating that it was "Main" or "Little Boy." Davis testified that she knew it was the young man's gun because he came back for it the next day. When asked why she had not mentioned the gun's owner in her testimony to the grand jury several months after Cradler's arrest, Davis gave an illogical response that she never learned of the gun's true owner until the "young man" came back for it the day after Cradler's arrest. She stated that the young man had since been killed.

Davis also testified that she forgets a lot of things because of her diabetes, but she was certain that the relevant events occurred in 2007. She also stated that she never filed a complaint with the MPD about the alleged police brutality, choosing simply to "bless [the officers] out" instead. Davis said that Cradler often rides with her because he has a nervous condition. She testified that Cradler had previously suffered a stroke and that she would never let any guns around him. When asked if she had spoken to Cradler about this arrest since that date, Davis initially testified that she had never talked to him about it, but then she admitted to speaking with him about it once, or maybe twice.

The third witness to testify was MPD Officer Dolphus McGee, Officer Arocho's partner. When asked if he had discussed his testimony with Officer Arocho, Officer McGee stated that Officer Arocho had only told him that he felt as if he was "under pressure" while giving his testimony. Officer McGee testified that he

5

observed Davis driving without a seatbelt while he was standing in the parking lot of a store on the corner of Chelsea and Seventh after finishing a previous traffic stop. After Davis parked her vehicle at the store, Officers McGee and Arocho pulled their squad cars up behind Davis's truck and stepped out to initiate contact. Officer McGee stated that he approached the driver's side and Officer Arocho approached the passenger's side. After Officer McGee spoke with Davis and was returning to his squad car to run her identification, Officer Arocho informed him that Cradler was being uncooperative.

Officer McGee testified that he approached the passenger's side from the rear of the vehicle as Officer Arocho asked Cradler to get out of the vehicle. He stated that, as Officer Arocho opened the door for Cradler to step out, he noticed a gun on Cradler's lap. Officer McGee drew his weapon and instructed Cradler to raise his hands. As Cradler raised his hands, the gun slid off his waist area and fell to the ground outside the vehicle. Officer Arocho immediately placed Cradler in handcuffs, and Officer McGee then proceeded to handcuff Davis because she had already admitted to driving on a suspended license. Officer McGee stated that Davis never exited the vehicle, was never physically harmed by him or Officer Arocho, and was only arrested because she had three or more previous suspensions of her license.

After Cradler was in handcuffs, Officer McGee informed Officer

Arocho that he had noticed a gun in Cradler's lap. He also testified that he did not hear anyone ask Cradler questions prior to his signing the rights waiver form. Officer McGee did not question Cradler, and he stated that Cradler was cooperative once he stepped out of the vehicle.

The fourth witness to testify was Tony Thomas, a friend of Cradler. Thomas testified that he was across the street when Davis's truck pulled into the store parking lot at Chelsea and Seventh. He stated that the officers were across the street prior to the stop. Thomas also said that Davis was out of the truck and had her hand on the store's door when the officers ordered her back. He also stated the officers ordered Cradler out of the truck without ever asking him any questions.

Thomas testified that he knows Cradler "from around the neighborhood" because he sees him different places. Thomas also stated that he lives on the streets and walked to court that morning. When questioned about his criminal history, Thomas admitted to convictions for aggravated assault, failure to pay child support, criminal attempt felony, and aggravated burglary. He continued to maintain his innocence in all his crimes, despite his own acknowledgment that he plead guilty. He knew that the event occurred in 2006, but he did not recall the month or day, only remembering that it was cold. Thomas also stated that the officers grabbed Davis and "shook her up." Thomas did not,

7

however, report the incident because it was not his business and he did not mess with the police. He said he never heard the officers ask for Davis's license, but he did hear Davis yelling at the officers.

Last to testify was Linda Williams. Williams testified that she was going to the store where Davis had parked. She observed the police on the same side of the street as Davis and that Davis was sitting in her truck counting money when the officers turned their blue lights on. Williams stated that she heard Cradler being told to get out of the truck, but she did not see anything. She said there were people arguing, but she did not want to stay around and see what happened.

Williams stated that both she and Thomas are friends with Davis. She admitted to speaking with Davis about the events that happened on November 25, 2006, as Davis drove her to the hearing that morning. She also stated that, before the hearing, she heard Davis talking to Cradler about what happened that day, and Thomas was standing close by.

This court finds the testimony of Officers Arocho and McGee to be fully credible. On all relevant matters essential to the Fourth Amendment issues herein, the law enforcement officers corroborated each other's testimony and such testimony was believable. In contrast, the court finds the testimony of Davis, Thomas, and Williams to be non-credible. Davis declared that she was certain

the arrest took place in 2007, which was incorrect. Furthermore, Davis seemed to increasingly exaggerate details as her testimony went on, blaming the many inconsistencies in her testimony on her diabetes and resulting forgetfulness. Both Thomas and Williams offered only limited information, with much of it centering around Davis and her interaction with the officers instead of the actions involving Cradler. The failure of all three witnesses - Davis, Thomas, and Williams - to report the alleged police misconduct creates serious doubts as to whether the conduct ever occurred, and, as such, casts doubt on the overall truthfulness of their stories. Thomas's long criminal history and, as testified to by Williams, friendship with Davis calls into question his trustworthiness as a disinterested witness and motives. Williams' testimony suggests that Davis has used her relationships with both Thomas and Williams to encourage them to testify to a version of events that would be favorable for Cradler. Accordingly, the court finds that the events leading to the arrest of Cradler and the discovery and seizure of the gun occurred as described by the testimony of Officers Arocho and McGee and as set forth herein.

PROPOSED CONCLUSIONS OF LAW

At the close of the evidentiary hearing, both sides agreed that it was undisputed that Officers Arocho and McGee executed a valid and legal traffic stop of Davis. Furthermore, there is no dispute as to whether Cradler received proper Miranda warnings.

The only remaining issues are whether the officers could properly order Cradler to step out of the vehicle during a traffic stop related to a violation that Davis committed and whether that order, and subsequent detention, search, and evidence seizure, violated Cradler's rights under the Fourth Amendment.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. Police officers may make valid traffic stops when they have probable cause or reasonable suspicion to believe that a person has committed a traffic violation. *See United States v. Sanford*, 476 F.3d 391, 395 (6th Cir. 2007). In *Maryland v. Wilson*, the Supreme Court held that after officers have stopped a vehicle, they may "order passengers to get out of the car pending completion of stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). In reaching this decision, the Supreme Court reasoned that danger to officers is greater when there are passengers in addition to the driver in the stopped vehicle and the additional intrusion on the passenger is minimal. *Id.* at 414-15. Officers are also allowed to ask the occupants of a stopped vehicle "general questions of who, what, where, and why regarding their . . . travel." *United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007)(citing *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999); *United States v. Erwin*, 155 F.3d 818, 822-23 (6th Cir. 1998)).

When a person claims that his or her Fourth Amendment rights

are violated during a traffic stop, the analysis must focus on the reasonableness of the officers' actions as determined by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). A seizure that begins as a lawful traffic stop "may become an impermissible seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *Ellis*, 497 F.3d at 612 (citations omitted). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *Id.* at 612-13 (citations omitted). Courts must look at the totality of the circumstances in each case to determine "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 613 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted). This totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002).

In the present case, Cradler was a passenger riding in a vehicle driven by Davis. The parties have agreed that the traffic stop of Davis was valid because she was seen driving without wearing a seatbelt. Thus, when Davis's vehicle became the subject

11

of a traffic stop, Officer Arocho would have been well within his authority to order Cradler to step out of the vehicle. Officer Arocho did not, however, order Cradler out of the vehicle at first, choosing instead to ask him questions about his identity. Cradler could not provide identification or remember his correct birthday or social security number. Suspicious as to Cradler's true identity, it was at this point Officer Arocho ordered Cradler out of the vehicle. Under a totality of the circumstances analysis, reasonable suspicion existed for the brief further detention of Cradler because of his inability to provide identification, remember his date of birth or social security number, and his vague and inconsistent answers to Officer Arocho's questions. *See, e.g., Ellis*, 497 F.3d at 614 (finding defendant's lack of knowledge of his own social security number a factor supporting further brief detention at a traffic stop).

Deciding to briefly further detain Cradler in order to determine his true identity, Officer Arocho ordered him to exit the vehicle. It was at this point the gun fell out and hit the ground. Ordering Cradler to exit the vehicle was not an unreasonable detention when viewed under the aforementioned circumstances, especially considering the fact the gun fell out of the vehicle immediately as Cradler exited. The immediate discovery of the gun bars any argument that the gun was the product of any lengthy and unreasonable detention of Cradler after he exited the vehicle. As

12

such, the lawful traffic stop and investigation of Cradler could not have evolved into an impermissible seizure because it did not take place over an unreasonable period of time or under unreasonable circumstances.

In summary, the officers had the right to ask Cradler to exit the vehicle at all times during the traffic stop. They also had the right to ask him questions regarding his identity. The gun was discovered immediately upon Cradler's exiting of the vehicle. Accordingly, under the circumstances involved with this traffic stop, the questioning of Cradler, the ordering him out of the vehicle, and the subsequent seizure of evidence were in no way a violation of his rights under the Fourth Amendment.

## RECOMMENDATION

For the foregoing reasons, it is recommended that Cradler's motion to suppress be denied.

    s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE
DATE: February 28, 2008

## NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.

ANY PARTY OBJECTING TO THIS REPORT MUST MAKE ARRANGEMENTS FOR A TRANSCRIPT OF THE HEARING TO BE PREPARED.